UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
at LEXINGTON

CIVIL ACTION NO. 5:08-00507-KKC

WILLIE R. MEADS                                                                    PLAINTIFF

v.                              **<u>MEMORANDUM OPINION AND ORDER</u>**

DIXIE CONSUMER PRODUCTS, LLC,
STEPHANIE PICARD, GUY KEALLY,
WAYNE PENKALSKI and SUSAN
KEERAN,                                                                            DEFENDANTS

* * * * * * * * * * * * * *

This matter is before the Court on Defendants' Motion for Summary Judgment (Rec.

134). Plaintiff Willie R. Meads ("Plaintiff") alleges that he was the subjected to racial

discrimination, a hostile work environment and retaliated against for filing complaints about

racial discrimination while employed by Defendant Dixie Consumer Products, LLC ("Dixie").

Plaintiff has also named as Defendants various Dixie management level employees including

Stephanie Picard ("Ms. Picard"), Guy Keally ("Mr. Keally"), and Wayne Penkalski ("Mr.

Penkalski").

This matter is also before the Court on Plaintiff's Motions to Order Defendants to Put

Evidence into the Record (Rec. 135) and To Hold Defendants in Contempt for Perjury,

Fabricating Evidence, Acts of Bad Faith and for Hearing (Rec. 136). For the reasons set forth

below, the Court grants Defendants' motion for summary judgment and denies Plaintiff's

motions to order Defendants to put evidence into the record, to hold Defendants in contempt and

for a hearing.

# I.  FACTUAL BACKGROUND

The Dixie facility is located in Lexington, Kentucky and manufactures plastic and paper cups for consumer use.  (Penkalski Decl., Ex. A, ¶ 2).  Dixie's management team includes Ms. Picard, Plant Director since October 14, 2008; Mr. Penkalski who was Paper Operations Manager from 2003 until December 2009 and is currently Distribution Manager; and Mr. Keally, Manager of Human Resources since April of 2004.  (Picard Decl., Ex. B, ¶2; Keally Decl., Ex. C, ¶).

## A. Dixie's Code of Conduct

Dixie's Code of Conduct includes an employee behavior policy and progressive discipline policy.  According to Company policy, Dixie "strive[s] to provide a work environment where everyone is treated with dignity, respect, honesty, and sensitivity" and Dixie requires its employees to treat each other in a manner that is consistent with these goals.  (Keally Decl., Ex. C, ¶3 & Decl. Ex. 1).  Dixie also attempts to provide employees with a work environment that is free from aggressive and threatening behavior.  Accordingly, its Code of Conduct dictates that "[b]ullying, violence, threats, intimidation, and other disruptive behavior in the workplace will not be tolerated."  (Keally Decl., Ex. C, ¶3 & Decl. Ex. 1).

The Code of Conduct also contains a non-discrimination and anti-harassment policy and provides that violations of these policies may subject an employee to discipline up to and including termination.  Employees are expressly prohibited from retaliating against persons making good faith reports of violations of the Code of Conduct.  There are several ways that Dixie employees can report violations of the Code of Conduct.  Employees can elect to report violations to: (1) an immediate supervisor, (2) the manager of the facility, (3) the local Human

Resources leader, (4) the Corporate Human Resources Department, (5) the Law Department, (6) the Compliance and Ethics Department, or (7) make use of the GuideLine system. (Keally Decl., Ex. C, ¶3 & Decl. Ex. 1). GuideLine is a telephone system which allows employees to report complaints via telephone. One of the benefits of the GuideLine system is that employees may report complaints anonymously if they choose to do so. After a complaint is received, it is forwarded to the appropriate individual for investigation and determination. (Keally Decl., Ex. C, ¶4).

**B. Plaintiff's Employment History with Dixie**

Plaintiff was hired by Dixie as an auto packer on October 29, 2007. (Pl.'s Dep., Ex. D, 147:4-6, 189:8-23; Keally Decl., Ex. C, ¶9). Upon being hired, Plaintiff signed an acknowledgment of Dixie's Code of Conduct indicating that he had "read Georgia-Pacific's Code of Conduct and agree[d] to comply with the Georgia-Pacific policies and standards of conduct included in the Code of Conduct." (Pl.'s Dep., Ex. D, 183-85; Acknowledgment, Ex. E). Dixie requires its new employees to go through an orientation process, including training in Dixie policies, the Code of Conduct and training for the position for which the employee was hired. (Keally Decl., Ex. C, ¶10).

Plaintiff began training for the auto packer position on November 5, 2007 and was deemed qualified by his supervisor Susan Keeran on November 28, 2007. (Pl.'s Dep., Ex. D, 187-90; Qualification Notice, Ex. F; Keally Decl., Ex. C, ¶11). As an auto packer, Plaintiff's responsibilities included operating a packing compactor, entering production information into the computer, operating a machine to bag cups and loading bagged cups into boxes. (Penkalski Decl., Ex. A, ¶8).

3

Several months after Plaintiff began working for Dixie he was questioned during an investigation into an incident that occurred in his department. Plaintiff was separately interviewed by Mr. Keally and a corporate security investigator concerning the incident. Following these interviews, the Company determined that Plaintiff had not been consistent in his answers and appeared to misrepresent his knowledge of certain facts relevant to the investigation. While Dixie determined that some discipline was warranted, it determined that Plaintiff would remain employed provided he agreed to a Last Chance Agreement. Plaintiff signed a Last Chance Agreement on March 12, 2008, which provided that:

> You agree to follow all safety rules, procedures and regulations. Any violations of (1) any safety rule, procedure or regulation or (2) any other Company rule including the Code of Conduct, within the next 12 months will result in your termination.

(Pl.'s Dep., Ex. D, 219:14-221:23; Last Chance Agree., Ex. G). Both Plaintiff and the Union agreed to the terms of the Last Chance Agreement and did not file a grievance concerning this disciplinary action. (Pl.'s Dep., Ex. D, 219-21, 223-24; Last Change Agree., Ex. G; Keally Decl., Ex. C, ¶12.

When Plaintiff was questioned about the incident during his deposition, he testified that the disciplinary action taken had nothing to do with race. Plaintiff gave the following testimony:

Q.  Now, it mentions in here that a review of your testimony revealed you were not totally truthful in your answers?

A.  Yes, sir.

Q.  Okay. So what this indicates at least on its face, correct, is that the company believed that you had given inconsistent and untruthful testimony, correct?

A.  It means that Mr. Keally–Mr. Keally wanted to believe that. I don't even know if he believes it. I think it was more so in retaliation for me telling the person in Atlanta more information than I gave Mr. Keally.

Q.      In retaliation for just because–I think you mentioned that you thought he was
        embarrassed?

A.      Yeah, he was embarrassed.

Q.      Did you believe that such conduct was discriminatory in any way?

A.      Well, I don't think it had anything to do with discrimination.  I think it was just a
        retaliatory thing.

Q.      Retaliatory because it–well, retaliatory because of your race or because of what
        you told the gentleman from Atlanta?

A.      Because of what I told the gentleman from Atlanta.

Q.      Okay.  So not race based but–

A.      Right.

Q.      –others kinds of retaliation?

A.      Yes, sir.

(Pl.'s Dep., Ex. D, 221:12-222:21).

Despite the incident, Plaintiff's career at Dixie continued to advance and on March 28,

2008, he was deemed qualified as a treater operator.  Treater operators perform cup quality

checks, clear jams in the machines used to manufacture cups, run the cup treater and are required

to understand the process of the treating area.  Becoming a treater operator is also the first step

towards becoming a treater mechanic.  (Pl.'s Dep., Ex. D, 198-99; Keally Decl., Ex. C, ¶13).  To

be promoted to treater mechanic, an employee must understand how to run the treater machines

and make repairs to ensure that the machines run properly.  (Penkalski Decl., Ex. A, ¶6 & Decl.

Ex. 1).

Plaintiff began training for the treater mechanic position on June 9, 2008.  (Qualif.

Notice, Ex. N).  While in training, Dixie employees are placed into groups and are rotated to

different groups.  However, during training all employees receive the same pay and the same basic training - each employee works with a trainer and must meet the same qualifications. During Plaintiff's training, his initial supervisor Ms. Keeran noted that he was having:

> trouble with excessive chute jams, excessive throwing away of cups, watching the belt, running out of stock, working with the operator, not entering downtime into the Company's computer tracking system, not cleaning the machines as often as necessary, and focusing on running the treaters when the operator was gone rather than fixing them.

(Keally Decl., Ex. S, ¶4).  Due to these problems, on July 23, 2008 Ms. Keeran determined that Plaintiff's qualification period needed to be extended to allow him for time to qualify for the mechanic position.  (*Id*. at ¶5).

On July 24, 2008, Plaintiff placed a call to the Company Guideline and raised issues concerning his career advancement and alleged racial discrimination related to his training for the treater mechanic position.  (Keally Decl., Ex. C, ¶14 & Decl. Ex. 6).  Plaintiff alleged that he was placed in the worst training group, was forced to work under Ms. Keeran who was the worst supervisor and was not provided equal training opportunities, which resulted in unfair evaluations.  (*Id*.).  Dixie investigated Plaintiff's claims and transferred him to a different work group while the investigation was pending.  (Keally Decl., Ex. C, ¶14 & Decl. Exs. 6,7).  While being deposed, Plaintiff acknowledged that the transfer "addressed all the concerns."  (Pl.'s Dep., Ex. D, 216:2-7).

While the investigation was ongoing, Plaintiff also alleged  that he heard inappropriate comments from fellow employees and that white employees received preferential treatment during training.  (Keally Decl., Ex. C, ¶15; Pl.'s Dep., Ex. D, 280-83, 312-15, 336-37, 346-48; Pl.'s Letter 8/18/08, Ex. K; Pl.'s Letter 8/27/08, Ex. L).  Dixie interviewed several employees during the investigation - some white, some African-American - and they did not support

Plaintiff's allegations of mistreatment or racial discrimination and harassment. (Keally Decl., Ex. C, ¶15 & Decl. Ex. 7; Schwebs Decl., Ex. P, ¶4 & Decl. Ex. 1). Upon completing the investigation, Dixie determined that there had been no violation of its policies, and Chris Schwebs ("Ms. Schwebs") who was flown in for an on-site inspection met with Plaintiff. The purpose of the meeting was to explain the outcome of the investigation and to notify Plaintiff that despite the absence of evidence substantiating his race discrimination claims, a different supervisor was being assigned to review his work while he attempted to qualify for the treater mechanic position. (Keally Decl., Ex. C, ¶16 & Decl. Ex. 8; Schwebs Decl., Ex. P, ¶5).

Plaintiff completed his training under the new supervisor and was deemed qualified for the treater mechanic position on September 22, 2008. (Pl.'s Dep., Ex. D, 217-18; Qualification Notice, Ex. N). During his deposition, Plaintiff testified that he "was happy with the outcome" of the investigation and that indicated that he "was tickled...at the fact that they [Dixie] even done half of what they did." (Pl.'s Dep., Ex. D, 111:20, 112:1-3, 112:9-113:10; 273:17-274:9, 373-74; Pl.'s Letter 8/28/08, Ex. M). In addition, on September 15, 2008 Plaintiff wrote a letter to Ms. Schwebs after her inspection of the Dixie facility, indicating that he wished to withdraw his racial discrimination complaint and thanking her for her assistance. (Pl.'s Dep., Ex. D, 376-77; Pl.'s Letter 8/28/08, Ex. M; Schwebs Decl., Ex. P, ¶5 & Decl. Ex. 2).

On September 26, 2008, shortly after qualifying as a treater mechanic, Plaintiff was involved in an altercation with a fellow employee, James French ("Mr. French"). (Keally Decl., Ex. C, ¶17 & Decl. Ex. 9). Mr. French alleged that when he approached Plaintiff about a chute jam, Plaintiff struck him in the face. (Keally Decl., Ex. C, ¶17 & Decl. Ex. 9, 18-19). Dixie investigated the incident and suspended Plaintiff and Mr. French for five days pending the

outcome of the investigation. (Pl.'s Dep., Ex. D, 246-47; Keally Decl., Ex. C, ¶18). In conducting the investigation, Dixie spoke to Plaintiff, Mr. French and several other employees. Mr. French again claimed that Plaintiff struck him in the face. Marjorie Higgins stated that Plaintiff and Mr. French were standing face to face and that when she looked back at them Mr. French's hat was no longer on his head. (Keally Decl., Ex. C, ¶¶17-18 & Decl. Ex. 9, pp. 7, 8, 11). Another employee, Genett Conaster reported that Plaintiff and Mr. French were standing close together and that Plaintiff stood holding his fists clenched, stomped his foot and moved towards Mr. French. (Keally Decl., Ex. C, ¶17 & Decl. Ex. 9, pp. 6, 13). Plaintiff gave a different account of the incident. He stated that Mr. French made inappropriate comments to him and then ran away when Plaintiff walked towards him. He denied ever hitting Mr. French. (Keally Decl., Ex. C, ¶17 & Decl. Ex. 10). During a follow-up interview, Mr. French denied making inappropriate comments to Plaintiff and again claimed that Plaintiff struck him in the face. (Keally Decl., Ex. C, ¶17 & Decl. Ex. 9). During his deposition, Plaintiff did not specify what offensive language Mr. French used but claimed that he stated, "[w]e don't want you here; why don't you go back over on the wall; you do better back over there with those people." (Pl.'s Dep., Ex. D, 141:20-22).

In light of the contradictory evidence about the incident, Dixie determined that both Mr. French and Plaintiff participated in the altercation and violated the Code of Conduct. (Keally Decl., Ex. C, ¶18). Although Plaintiff was already on a Last Chance Agreement, Dixie determined that both Mr. French and Plaintiff should receive Last Chance Agreements. Plaintiff's Last Chance Agreement stated as follows:

> On September 26, 2008, during your shift you were involved in a verbal altercation with another employee. This type of behavior is unacceptable and directly conflicts with your

Code of Conduct training and resulted in a five (5) day unpaid suspension....This failure to treat a fellow employee with respect or any other violation of our Code of Conduct will result in your employment being terminated.

(Pl.'s Dep., Ex. D, 236-40; Last Chance Agreement, Ex. O). Plaintiff signed the agreement and neither he nor the Union filed a grievance concerning Dixie's disciplinary action. (*Id.*; Keally Decl., Ex. C, ¶18). Plaintiff acknowledged during his deposition that when he signed the Last Chance Agreement, he understood that a further violation of the Code of Conduct would result in his termination. (Pl.'s Dep., Ex. D, 239-40).

Shortly after returning to work from his suspension, Plaintiff was involved in a second altercation with a co-worker. On October 14, 2008, Vivian Tufano ("Ms. Tufano"), a white employee, submitted a complaint about Plaintiff on the GuideLine system claiming that he:

was acting crazy, jumping around from foot to foot. He was yelling and approached TUFONO [sic] and got in her face. MEADS was so close to her face that she could feel his spit hitting her face when he was yelling at her. TUFONO [sic] told him to get out of her face because she felt as if he had approached her in a very threatening manner. Meads continued to yell and try to mock TUFONO [sic]. TUFONO [sic] kept telling MEADS to get out of her face. He kept repeating what she was saying, while he was yelling and spitting in her face.

(Keally Decl., Ex. C, ¶19 & Decl. Ex. 11) (emphasis in original). During Dixie's investigation, Plaintiff admitted that he yelled at Tufano to get her attention because cups were being processed with no print and admitted that there was an exchange of words. During his deposition, Meads testified that Ms. Tufano came:

over to confront me on the situation. And she explained to me, she says, Look here, boy, I ain't going to be taking nothing off of you; I already know what you done did; I know what you think you're going to do. And my response to her was that you're the one that look like a boy and I just need you to fix these cups.

(Pl.'s Dep., Ex. D, 255:24-256:6).[1]  No third parties witnessed the incident between Meads and Ms. Tufano.[2]

Upon completing the investigation, Dixie determined that Plaintiff and Ms. Tufano both acted inappropriately and violated the Code of Conduct.  (Keally Decl., Ex. C, ¶21).  As a result, Ms. Picard determined that both employees needed to be disciplined.  (Keally Decl., Ex. C, ¶22; Picard Decl., Ex. B, ¶6).  Based on Plaintiffs' employment history, he was terminated on November 10, 2008.  (Pl.'s Dep., Ex. D, 263-64; Keally Decl., Ex. C, ¶22; Picard Decl., Ex. B, ¶6).  Ms. Tufano was not terminated because she did not have a prior disciplinary history, but was given a Last Chance Agreement for her role in the altercation.  (Keally Decl., Ex. C, ¶22 & Decl. Ex. 13).

On December 12, 2008, Meads filed a complaint against Defendants alleging racial discrimination, hostile work environment, retaliation and wrongful termination.  (Rec. 1).  Defendants filed the pending motion for summary judgment asserting that they are entitled to judgment as a matter of law on all claims asserted by Plaintiff.  (Rec. 134).

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure ("FRCP") 56, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file together

---

[1] In Meads' response to Defendants' motion for summary judgment, his account of what Ms. Tufano said to him during their altercation was far more racially hostile.  In his response, Meads claims that Tufano said, "[b]oy they just walked your black ass out of here last week nigger!  Boy if you think you're gonna run over me boy you got another thing coming Boy!  I'm not goanna [sic] put up with your fucking shit like them other dame [sic] people did."  (Rec. 141, Pl.'s Response at 18-19).  Meads claims that his only response to this racial attack was "you're the one that looks like a boy just fix the cup."  (*Id*. at 19).

[2] It appears that Dixie questioned several employees about the altercation but that none had first hand information.  For example, Jeffrey Phillips gave deposition testimony that he was questioned about the altercation but informed Dixie that he had no information.  (Rec. 137, Jeffrey Phillips Dep., Ex. 4, 8:25-9:10).

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to inform the district court of the basis for its motion and identify those portions of "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be met by the moving party by demonstrating the absence of evidence supporting any one or more of the essential elements of the non-moving party's claim. *Id.* at 322-25. Once this initial burden has been met, the non-moving party must present specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).

A party opposing a motion for summary judgment cannot "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A scintilla of evidence in support of the plaintiff's position is not enough because there must be enough evidence to allow a jury to reasonably find for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). This requires presentation of some evidentiary material beyond the pleadings in support of the plaintiff's position. *Celotex*, 477 U.S. at 324. Consequently, summary judgment must be entered against a party failing to make an adequate showing to establish the existence of an essential element to that party's case, for which it bears the burden of proof at trial. *Id.* at 322.

However, when considering a motion for summary judgment, the court must view the facts contained in the record and draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986); *see also 60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987). The court should not weigh the evidence or determine the truth of any disputed matter because the only determination for the court is whether sufficient evidence exists from which a jury could reasonably find for the non-moving party. *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). What the court must ultimately determine is whether there is a sufficient dispute about the evidence to require submission to the jury, or whether the evidence favors one side so strongly that it is entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 251-52. In addition, because Mr. Meads is proceeding *pro se*, this Court is required to construe his filings liberally. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005); *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972) (granting liberal construction to *pro se* filings).

## III.   RACE DISCRIMINATION CLAIM

Title VII makes it an unlawful employment practice "to...discharge any individual...because of such individual's race [or] color...." 42 U.S.C. § 2000e-2(a)(1). When a plaintiff only presents circumstantial evidence that his discharge was motivated by race, a Title VII discrimination claim must be examined under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). In this case, Plaintiff has not present direct evidence that his discharge was motivated by his race. Accordingly, the *McDonnell Douglas* framework applies.

Under this framework, Plaintiff bears the initial burden of persuasion to establish a *prima facie* case of discrimination by showing that he (1) is a member of a protected class, (2) was

subject to an adverse employment decision, (3) was qualified for the position or meeting his employer's legitimate expectations, and (4) was either replaced by a person outside of the protected class or was treated differently than other similarly situated employees who were not members of the protected class. *See Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *see also DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

In this case, the parties do not dispute that Plaintiff, who is African-American, is a member of a protected class. However, Defendants assert that Plaintiff cannot establish that he was subject to an adverse employment action. This argument is premised on Plaintiff's claims that he was placed in a poor working group and unfairly evaluated for a promotion to a mechanic position. The Sixth Circuit has recognized that an adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Reed v. UAW*, 569 F.3d 576, 584 (6th Cir. 2009). The Court recognizes that Dixie accommodated Plaintiff when he voiced concerns about his training and supervisor. Because Plaintiff ultimately qualified for the treater mechanic position and was transferred to a different training group and evaluated by a different supervisor, this alone would not qualify as an adverse employment action. However, Plaintiff also alleges that he was discharged based at least in part on his race. Accordingly, the Court finds that Plaintiff suffered an adverse employment action.

Plaintiff has made no showing that he was meeting his employer's legitimate performance expectations or qualified for his position when he was terminated. There is no dispute that Plaintiff was disciplined several times during his brief employment with Dixie. Plaintiff received two Last Chance Agreements and acknowledged during his deposition that the first Last Chance

Agreement was not related to race. The second Last Chance Agreement resulted from an altercation with Mr. French who claimed that Plaintiff struck him in the face. When Plaintiff returned to work after being suspended for that incident, he got into a second altercation, with Ms. Tufano which ultimately lead to his termination. Based on these repeated violations of the Code of Conduct, the Court finds that Plaintiff has failed to show that he was meeting Dixie's legitimate expectations at the time that he was discharged.

Plaintiff also fails to satisfy the fourth prong of his *prima facie* case because he has not shown that he was replaced by a person outside of the protected class or that he was "treated differently than similarly situated non-protected employees." *See Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). Plaintiff has presented no evidence regarding the race of the individual who replaced him. As a result, the parties' dispute regarding this prong focuses on whether Plaintiff was treated differently from other similarly situated employees who were not members of the protected class. To be considered "similarly situated" a plaintiff must demonstrate that he is "similarly-situated to the non-protected employee in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998); *see also Seay v. TVA*, 339 F.3d 454, 480 (6th Cir. 2003).

In the disciplinary context, the Sixth Circuit has required a showing that the plaintiff and the proposed comparator have engaged in acts of "comparable seriousness." *Clayton v. Meijer*, 281 F.3d 605, 611 (6th Cir. 2002). This requires looking at whether the individuals "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352; *see also*

*Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992) (explaining that to be a comparator, an individual must "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct.").

In this case, while Plaintiff points to several other employees who he alleges have been involved in altercations and been retained, he has not pointed to any other Dixie employee engaged in a similar pattern of misconduct and retained his job. For example, he claims that a fellow employee named Beth Beach ("Ms. Beach") was involved in an altercation with a fellow employee which involved death threats being made. Specifically, Plaintiff claims that Ms. Beach told Paul Rappa "I'll blow your dame [sic] head off." (Rec. 137, Pl.'s Response at 22). However, when Dixie investigated this incident there was no evidence that Ms. Beach threatened anyone and she was not disciplined. When Ms. Beach was questioned about the incident during her deposition, she testified that:

> [it] was a misunderstanding and I left the factory, he left the factory. I drove over to where he was parked, I got out, he got out, and I asked him to quite [sic] fussing and arguing or we was both going to lose our job. And if he didn't think no more of his job than that, I did, because I needed my job....And he agreed, and he said okay, and he left, and I left. And that was all there was to it.

(Rec. 137, Beth Beach Dep., Ex. 10, 6:8-15, 6:17-19). Tellingly, there is no indication that Ms. Beach had a history of altercations with her fellow employees or that these altercations were similar to Plaintiff's altercations. As a result, she does not qualify as a similarly situated employee.

The Court also notes that both Ms. Tufano and Mr. French, who were involved in altercations with Plaintiff, received the same discipline that he did for violating the Code of Conduct. Because Plaintiff cannot make a *prima facie* showing that he was meeting Dixie's

legitimate employment expectations when he was discharged and because he has failed to show that similarly situated employees who were not members of the protected class were treated differently then he was, Defendants are entitled to judgment as a matter of law on the race discrimination claim.

In addition, Plaintiff has failed to show that Dixie's reason for his discharge - his multiple violations of the Code of Conduct - was pretextual. The burden of showing pretext clearly shifted to Plaintiff once Dixie offered a legitimate reason for his discharge. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802-03. As discussed previously, Dixie accommodated Plaintiff throughout his employment with the company despite a pattern of behavior that was inconsistent with its Code of Conduct.

## IV.    HOSTILE WORK ENVIRONMENT

Plaintiff also claims that he was subjected to a racially hostile work environment. To establish a *prima facie* case for a hostile work environment claim, Plaintiff must provide evidence from which a jury could reasonably find that he: (1) is a member of a protected class, (2) was subjected to unwelcomed racial harassment, (3) that the harassment was race based; (4) that the harassment unreasonably interfered with his work performance by creating an environment that was intimidating, hostile, or offensive, and (5) employer liability. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

The Court finds that Plaintiff has produced no evidence that Dixie "knew or should have known of the [harassing] conduct, and that its response manifested indifference or unreasonableness." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). On the contrary, as has been discussed throughout this opinion, on those few occasions where Plaintiff

made complaints of racial discrimination, Dixie took the complaints seriously and conducted thorough investigations.

For example, when Plaintiff complained about his training group for the treater mechanic position, he was moved to another group and evaluated by a different supervisor, despite the fact that Dixie's investigation could not substantiate his racial discrimination claims. During his deposition, Plaintiff admitted that Dixie acted on his complaints and stated that he was satisfied with the outcome of the investigation. Plaintiff also alleges that Dixie did not investigate his race discrimination claims with respect to the incidents with Mr. French and Ms. Tufano. However, the record supports the opposite conclusion. Dixie thoroughly investigated both altercations and both Mr. French and Ms. Tufano were disciplined for their roles in the altercations. As a result, Plaintiff's claim that Dixie ignored his racial discrimination and retaliation claims is not supported by the evidence in the record.

Plaintiff is also unable to make a *prima facie* showing that his work environment was hostile. Courts in the Sixth Circuit have held that isolated incidents do not rise to an actionable level of harassment. *Jackson v. Quanex*, 191 F.3d 647, 658 (6th Cir. 1999). Plaintiff has alleged several incidents which he claims created a racially hostile work environment. First, he claims that someone was turning off and tampering with equipment and company property to make it appear that he was struggling and having problems performing his job. However, Plaintiff has presented no evidence that these acts in fact occurred or that they had anything to do with his race. In addition, there is evidence that Plaintiff was in fact having difficulty with his training for

the treater mechanic position as Dixie claims.[3]  Accordingly, these allegations do not support the hostile work environment claim.

Plaintiff next alleges that someone wrote the word "Nigger" on his truck.  However, Plaintiff acknowledges that he did not submit a written complaint when the incident happened. (Rec. 134, Pl.'s Dep., Ex. D, 384:3-8).  In addition, while being deposed Plaintiff admitted that he did not know who wrote the offensive language on his truck and that it could have been anybody and may have happened away from the workplace.[4]  (Rec. 141, Pl.'s Dep., Ex. T, 384:9-18). Because Plaintiff has no knowledge who wrote the offensive language on his truck, or where or when the incident occurred, his speculation that the word could have been written on his truck by a Dixie employee does not support his hostile work environment claim.

Plaintiff also alleges that his work environment was racially hostile because fellow employees made comments when he wore a t-shirt supporting then presidential candidate Barack Obama.  However, Plaintiff has not specified what comments were made or whether they were directed at his race or political affiliation.  Plaintiff also alleges that lies were made about his training and that training was refused.  Not only are these allegations vague, they are also contrary to the facts in the record.  During his tenure at Dixie, Plaintiff's career appears to have advanced normally and there is no evidence that he was denied any training.  When he complained about having Ms. Keeran as his supervisor and about the training group he was in,

_____

[3] During his deposition testimony, fellow employee Jeffrey Phillips testified that he was questioned by Dixie about Plaintiff's progress and told the company that he was "having struggles.  And, you know, time, that...[he] needed a little more time."  (Rec. 137, Jeffrey Phillips Dep., Ex. 10, 6:18-22).

[4] Plaintiff testified that he informed Mr. Keally "that this could have happened at Wal-Mart because I was at Wal-Mart all last night or the night before or something to that nature.  I just know that it was on the truck."  (*Id*. at 384:21-385:1).

Dixie investigated thoroughly, moved him to a different training group and assigned him to a different supervisor. As has been discussed on several occasions throughout this opinion, Plaintiff indicated that he was satisfied with the outcome of the investigation and was ultimately deemed qualified for the treater mechanic position.

Plaintiff next claims that Defendants hid evidence including past racial comments made by Ms. Tufano. However, it is unclear how this would have contributed to a hostile work-environment. Plaintiff has not alleged that any of these past comments were made to him or in his presence. In fact, he has not even alleged that he was aware of these comments while he was employed by Dixie. The only evidence in the record indicates that Dixie investigated an allegation against Ms. Tufano for using racially offensive language and was unable to substantiate it. Plaintiff fails to explain how Defendants hid this evidence from him.

Plaintiff also claims that Dixie's failure to question eyewitnesses supports his claim of a hostile work environment. However, once again these allegations are vague and Plaintiff fails to explain what witnesses Dixie failed to question. Dixie investigated every incident that Plaintiff was involved in and every complaint that he raised. Dixie also questioned numerous witnesses. While Plaintiff may not have been satisfied with the scope of the investigations that were performed, such shortcoming are insufficient to create a hostile work environment where the employer conducts a thorough investigations and operates in good faith.

Essentially, what Plaintiff is left with is the claim that certain employees made "African jungle noises when" he walked into the company cafeteria and that one of his supervisors made a comment that he should "go back to the wall with all the other blacks and Mexicans." He also claims that his altercations with Mr. French and Ms. Tufano were racially motivated. Even

accepting that these incidents occurred as Plaintiff describes them, they are not sufficiently

pervasive, hostile or abusive to make the requisite showing of a hostile work environment. *See*

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16, 122 S. Ct. 2061, 153 L. Ed. 2d 106

(2002) (indicating that hostile work environment claims "involve[] repeated conduct" and require

a plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's

employment and create an abusive working environment[.]"). Accordingly, Defendants are

entitled to judgment as a matter of law on Plaintiff's hostile work environment claim.

## V. RETALIATION CLAIM

Finally, Plaintiff claims that Defendants retaliated against him after he filed complaints of

racial discrimination. To establish a *prima facie* case of retaliation, Plaintiff must provide

evidence that (1) he engaged in protected activity, (2) his employer knew of the exercise of the

protected right, (3) an adverse employment action was subsequently taken against him, and

(4) there was a causal connection between the protected activity and the adverse employment

action. *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009).[5] After a plaintiff

successfully makes a *prima facie* showing, the burden shifts to the employer to produce evidence

of a legitimate non-discriminatory reason for the adverse employment action. *Id.* Once Dixie

offers a legitimate non-discriminatory reason for the adverse employment action, the burden

---

[5] It is unclear whether Meads also attempts to assert a retaliation claim under Kentucky law. However, such a claim would be analyzed in the same manner as a Title VII retaliation claim. *See,e.g.*, *Mills v. Gibson Greetings*, 872 F. Supp. 366, 371 (E.D. Ky. 1994)(noting that because "the Kentucky discrimination statute is modeled after, and is virtually identical to, Title VII...Kentucky courts have, therefore, followed federal law in interpreting its anti-discrimination statute."); *see also Mountain Clay, Inc. v. Commonwealth Com. on Human Rights*, 830 S.W.2d 395, 396 (Ky. App. 1992) (indicating that retaliation claims under the Kentucky Civil Rights Act are interpreted the same way as Title VII retaliation claims).

shifts back to Plaintiff to demonstrate that this reason was pretextual. *Id.*

In this case, there is no dispute that Plaintiff engaged in protected activity by making complaints of racial discrimination, that Dixie was aware of the complaints and that Plaintiff suffered an adverse employment action when he was terminated several months after making the complaints. However, because the Court finds that Plaintiff has failed to present sufficient evidence to allow a reasonable jury to find a causal connection between his termination and his complaints of racial discrimination, Defendants are entitled to judgment as a matter of law and the retaliation claims under Title VII and the Kentucky Civil Rights Act.

As discussed throughout this opinion, there is strong evidence that Plaintiff was terminated because of his repeated violations of the Code of Conduct. In addition, Plaintiff's claim that he was retaliated against for making a racial discrimination claim is contradicted by the actions that Dixie took in response to his claim. During his deposition testimony, Plaintiff acknowledged that he was satisfied with the outcome of the investigation of his race discrimination claim and that the company investigated the issues that he raised. When asked whether he was pleased with the result of the investigation, Plaintiff testified, "I was tickled–I was happy at the fact that they even done half of what they did." (Rec. 134, Pl.'s Dep., Ex. D, 373:18-22).

In support of a causal connection between his termination and his complaints of racial discrimination, Plaintiff asks the Court to consider the temporal proximity between the racial discrimination complaint he made July 2008 and his termination in November 2008. While temporal proximity is a factor that this Court must consider, temporal proximity alone is insufficient for an inference of retaliatory discrimination where there is an absence of other

compelling evidence in the record. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). In this case, there is simply no additional evidence supporting a jury's finding that Plaintiff's filing of a race discrimination claim was related to his subsequent termination. Plaintiff primarily relies on his personal opinions and suspicions in support of his claim that the discharge must have been related to his race discrimination complaint. However, in the absence of an evidentiary basis, such suspicions are insufficient to survive a motion for summary judgment. *See, e.g.*, *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005).

The Court also notes that Plaintiff has also failed to presented sufficient evidence to show that the legitimate non-discriminatory reason offered for his termination - multiple violations of the Code of Conduct - was pretextual. Plaintiff was given several chances to succeed at Dixie. He received several promotions, including being qualified as a treater mechanic and his complaints of racial discrimination were investigated thoroughly and taken seriously. Plaintiff was not terminated until he violated the Code of Conduct for a third time in a one year period of employment and has offered insufficient evidence to show that these repeated violations did not occur or were related to his complaints of race discrimination. Accordingly, Defendants are entitled to a judgment as a matter of law on the retaliation claims under Title VII and the Kentucky Civil Rights Act.

## VI.     MOTION TO ORDER THE DEFENDANTS TO PUT EVIDENCE INTO THE RECORD

Plaintiff has filed a motion objecting to the Defendants' filing of excerpts from his deposition testimony in support of their motion for summary judgment and seeks an order from the Court requiring Defendants to file the entire deposition transcripts in the record. (Rec. 135). However, because Defendants' filing complies with both federal and local rules, the motion will

be denied.  It was not impermissible for Defendants to file excerpts of those portions of Plaintiff's deposition that they relied on in support of their motion for summary judgment.  In addition, Plaintiff was free to file those portions of his deposition contradicting Defendants' arguments and supporting his claims along with his response to Defendants' motion for summary judgment.  In doing so, Plaintiff could have directed the Court's attention to any relevant portions of his deposition that Defendants' may have omitted, mischaracterized or which supported his claims.  The Defendants are not responsible for Plaintiff's failure to do so.  In addition, Plaintiff has offered no legal authority for any error on the part of Defendants.  Accordingly, Plaintiff's motion is denied.

## VII.    PLAINTIFF'S MOTION TO HOLD DEFENDANTS IN CONTEMPT OF COURT

Plaintiff also seeks to have Defendants held in contempt of Court based on sworn affidavits submitted by Mr. Keally and Ms. Picard.  (Rec. 136).  To the extent that the Defendants' motion for summary judgment relied on the affidavits of Mr. Keally and Ms. Picard, Plaintiff was free to introduce into the record any evidence, including depositions and affidavits contradicting their affidavits.  However, Plaintiff has provided the Court with no basis for holding any of the individual Defendants in contempt of Court.  Accordingly, Plaintiff's motion to hold the Defendants in contempt of court is denied as is Plaintiff's motion for a hearing on this motion.

## VIII.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

(1)     Defendants' Motion for Summary Judgment (Rec. 134) is **GRANTED** as to all claims asserted by Plaintiff.

(2)     Plaintiff's Motion to Order the Defendants to Put Evidence Into the Record (Rec. 135) is **DENIED.**

(3)     Plaintiff's Motion to Hold Defendants in Contempt of Court (Rec. 136) and request for a hearing on this motion is **DENIED.**

(4)     Defendants' Motion for Extension (Rec. 144) is **DENIED as moot.**

(5)     This matter is hereby **dismissed** and **STRICKEN** from the Court's active docket.

(6)     A separate judgment in favor of Defendants will be entered concurrently herewith.

This the 10th day of August, 2010.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**